## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

FRANCIS X. DECAMBRA,

     Petitioner,

v.                                    Case No. 4:19-cv-506-MW-MJF

MARK INCH,

     Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Francis Decambra, proceeding with counsel, has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 3), with supporting memorandum (Doc. 7). Respondent ("the State") answered, providing relevant portions of the state court record. (Doc. 13). Decambra replied. (Doc. 17). The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Decambra is not entitled to habeas relief.[1]

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

# I.   BACKGROUND AND PROCEDURAL HISTORY[2]

This case involves Decambra's sexual and financial exploitation of two disabled adults in June of 2008. Decambra's victims were W.M. and A.R.

W.M. has cerebral palsy and is physically incapacitated from the waist down. W.M. is confined to a wheelchair and is legally blind. The cerebral palsy restricts not only her mobility, but also her ability to bathe, dress, and use the toilet.

A.R. suffers from an intellectual disability which was described at trial as "mild mental retardation." (Doc. 13-1, Ex. D at 228). A.R. was deprived of oxygen just before birth when his umbilical cord wrapped around his neck. As a very young child, A.R. suffered developmental delay in language and walking. Throughout his school career, A.R. was in Special Education classes and graduated from high school with a Special Education degree. After he graduated from high school, A.R. moved out of his parents' home and got an apartment. A.R.'s father stated:

> He wanted to be like everybody else. He wanted to be independent. And in order to do that, he was a little enthusiastic, let's say, about being

---

[2] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. (Doc. 13-1, Exs. C-E (Trial Tr.)); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

[3] A "developmental disability," for purposes of qualifying for services from the Agency, is defined in Section 393.063(12), Florida Statutes. "Disabled Adult," for purposes of the criminal statutes under which Decambra was convicted, is defined in Section 825.101, Florida Statutes. *See also* Doc. 13-1, Ex. A at 45 (Jury Instr.).

independent. His capabilities really didn't allow him to be that way, but he asserted himself and tried to be as independent as he could.

(Doc. 13-1, Ex. D at 182). A.R. lacks sufficient understanding to make reasonable decisions about certain aspects of his life, for example, how to manage his finances. His parents manage his checking account and make his rent payments. At one time A.R. obtained his driver's license, but it was suspended twice for accumulating too many points in a 1-year period from speeding tickets, car accidents, and other traffic infractions. A.R.'s license was never reinstated.

The above is just a snapshot of the evidence of the victims' disabilities and obviously does not account for evidence that the jury observed but cannot be captured in a trial transcript.[3] This "Facts" section is intended merely to provide context for Decambra's claims, as this court is not called upon to address directly the sufficiency of the evidence that either victim was a "disabled adult" or "lack[ed] capacity to consent" under the criminal statute. Decambra does not claim that the evidence was insufficient to sustain a conviction on either of these elements.

---

[3] The trial judge, in finding that there was sufficient evidence that the victims were "disabled adults" within the meaning of the criminal statute, noted that some of the evidence was "demeanor." (Doc. 13-1, Ex. D at 301).

Page 3 of 82

W.M. and A.R. had been dating since 2000 and were engaged to be married.[4] W.M. and A.R. met Decambra through the State of Florida Agency for Persons with Disabilities ("the Agency"). W.M. and A.R. received services from the Agency because each suffered from a developmental disability.[5] Decambra, provided "supportive living coach" services to A.R., and later to W.M., through the Agency. A supportive living coach assists Agency clients in areas such as financial management and banking, shopping, personal relationships, and coordinating appointments, and provides other services for which clients qualify under the Florida Medicaid Waiver Program.

At the time Decambra exploited A.R., he had been A.R.'s supportive living coach for approximately 5 years. Decambra assisted A.R. primarily with shopping and paying bills. A.R. viewed Decambra as an authority figure. A.R. had known

---

[4] Throughout Decambra's counseled memorandum, he labels W.M. as "Wife" and A.R. as "Husband." (Doc. 7). This misrepresents the record. W.M. and A.R. were not married at the time of Decambra's crimes or at the time or trial.

[5] For purposes of receiving Agency services, a "developmental disability" is defined as:

> a disorder or syndrome that is attributable to retardation, cerebral palsy, autism, spina bifida, or Prader-Willi syndrome; that manifests before the age of 18; and that constitutes a substantial handicap that can reasonably be expected to continue indefinitely.

Fla. Stat. Ann. § 393.063(9) (effective July 1, 2006 to June 30, 2013).

Decambra for several years, relied on him a great deal, and looked up to him for advice and assistance. When Decambra told A.R. to do something, A.R. complied because he wanted to make Decambra happy, he did not want to make him angry, and he was afraid of what Decambra would say if he told him no.

A.R. had credit card accounts with Best Buy and Kay Jewelers which Decambra helped him manage. Between June 1, and June 26, 2008, Decambra used A.R.'s Best Buy and Kay Jewelers credit cards to purchase items for himself and his wife.

On June 2, 2008, W.M. had surgery on her foot and was in a rehabilitation center until June 19, 2008. During that time, Decambra took A.R. to his (Decambra's) home, showed A.R. pornographic movies of men and women having sex, and then asked A.R. if he wanted to do the same things as the people in the movies. A.R. told Decambra yes even though he did not want to have sex with Decambra. A.R. wanted to make Decambra happy and was afraid to say no. Decambra performed oral sex on A.R. and licked his nipples, and Decambra then asked A.R. to reciprocate. A.R. complied because he was afraid to tell Decambra no.

W.M. returned home from the rehabilitation center on June 19, 2008. W.M. was in the process of receiving a new supportive living coach due to her prior coach's

retirement. At Decambra's suggestion, W.M. requested that Decambra become her supportive living coach.

On June 23, 2008, W.M. and Decambra met with W.M.'s support coordinator (Dquan Brigham) and W.M.'s counselor (Rhonda Wiggins) at W.M.'s home to discuss Decambra becoming W.M.'s living coach.[6] A.R. also was present. After the meeting ended and Brigham and Wiggins left, Decambra asked A.R. if W.M. had showered that day. A.R. responded that W.M. could not shower because of her recent surgery. Decambra suggested wrapping W.M.'s leg in a plastic bag so she could take a shower. W.M. agreed to Decambra's suggestion, knowing that A.R. would be the one helping her shower.[7]

A.R. helped W.M. into the bathroom, and W.M. undressed. A.R. remained fully clothed. A.R. then assisted W.M. into the shower. Decambra entered the

---

[6] A "support coordinator" is a person "who is designated by the agency to assist individuals and families in identifying their capacities, needs, and resources, as well as finding and gaining access to necessary supports and services; coordinating the delivery of supports and services; advocating on behalf of the individual and family; maintaining relevant records; and monitoring and evaluating the delivery of supports and services to determine the extent to which they meet the needs and expectations identified by the individual, family, and others who participated in the development of the support plan." Fla. Stat. § 393.063(41).

[7] Agency rules forbade a male supportive living coach from toileting or bathing a female client. W.M. was assigned a female in-home support person for that purpose, but also relied on A.R. to assist her with essential self-care activities such as bathing, dressing, and toileting.

Page 6 of 82

bathroom to help W.M. wrap her leg. W.M. had given Decambra permission to be in the bathroom to wrap her leg, but had not given him permission to be in the bathroom while A.R. bathed her. After wrapping W.M.'s leg, Decambra took the shower hose, soaked A.R. with water, and directed him to take off his clothes and get it the shower with W.M. Decambra explained: "Well, she's wet and you are wet, so both of you all can take a shower." (Doc. 13-1, Ex. C at 116). A.R. complied, took off his clothing and got into the shower with W.M. Decambra left the bathroom.

While A.R. was bathing W.M., Decambra returned to the bathroom with a camera and began photographing A.R. while he bathed W.M. W.M. saw the flash of the camera and told Decambra to stop. Decambra insisted that she continue with the shower and not worry about him. Decambra continued taking pictures, commenting on how much money he could make off of them.

After the shower, A.R. assisted W.M. to the toilet and dried her off. W.M. asked for her clothing, but Decambra told her they were going to move her to the bedroom. A.R. carried W.M. to the bedroom and laid her on the bed. Both A.R. and W.M. were naked. Decambra then grabbed W.M.'s hand and placed it on A.R.'s penis. W.M. pulled her hand back, but Decambra grabbed her hand again, placed it back on A.R.'s penis and told her to rub it.

Decambra then told A.R. to rub lotion on W.M., directing him specifically "where to rub and how to rub," including between W.M.'s legs. (Doc. 13-1, Ex. C at 53). When A.R. reached W.M.'s vagina, Decambra instructed A.R. to "instead of putting your fingers in there, in her vagina, put your penis in there." (*Id*.). A.R. complied. Decambra continued directing A.R. and W.M. in the performance of sexual acts—directing their movements and positioning them while taking photographs and expressing satisfaction with how much money each image could fetch. When W.M. again expressed dissent, Decambra told her to "just keep doing what you're doing." (Doc. 13-1, Ex. C at 55). W.M. and A.R. did not want to engage in the sexual activity, but felt forced to comply with Decambra's directions.

Three days later, on June 26, 2008, W.M. and A.R. were having breakfast in W.M.'s home when Decambra appeared unexpectedly and announced he was there to change the dressing on W.M.'s leg. W.M. was surprised because her doctor's office was scheduled to change her dressing. W.M. waited for Decambra to leave the room and then called her doctor's office to clarify. Decambra returned and questioned W.M. about her phone call. After learning she had called her doctor's office, Decambra became angry and accused W.M. of harassing her doctor. He then called (or pretended to call) someone at the Agency and declared that they needed to find someone else to be W.M.'s supportive living coach. After he hung up,

Decambra told W.M. she needed another shower. W.M. agreed to a take a sponge bath with A.R.'s assistance.

W.M. and A.R. went into the bathroom, and A.R. started bathing W.M. Decambra entered—this time with a video camera—and began filming the bath. W.M. told Decambra to stop and to leave, but Decambra ignored her and continued filming while commenting "how sweet it is of [A.R.] giving his fiancé a bath." (Doc. 13-1, Ex. C at 68). When A.R. finished the bath, he carried W.M. to her bed.

Decambra told W.M. that she needed a fresh bandage and that he would go out and buy bandages. W.M. gave Decambra permission to use her debit card to buy bandages. Decambra left W.M. naked on the bed, covered by a sheet, and took A.R. to a grocery store. There, Decambra purchased not only bandages with W.M.'s card, but also KY Jelly.

After Decambra and A.R. returned and changed W.M.'s bandage, Decambra told W.M. that he and A.R. were going out to buy more bandages. Instead of taking A.R. to buy bandages, however, Decambra took him to a sex toy store, picked out condoms, a pornographic movie, and a dildo, and told A.R. to purchase the items. A.R. complied.

When Decambra and A.R. returned to W.M.'s home, A.R. told Decambra he was going to take a nap. Decambra insisted: "Okay, you all two have sex before you

Page 9 of 82

all take a nap." Decambra then announced to W.M. that A.R. had a surprise for her. W.M. saw the bag from the sex toy store and responded, "You all wasted your money." Decambra insisted: "Don't knock it until you try it." (Doc. 13-1, Ex. C at 71).

Decambra then directed A.R. and W.M. in the performance of various sexual acts while filming them—including vaginal sex with the dildo, oral sex with A.R.'s penis, and other sexual acts. Whenever W.M. expressed resistance, Decambra insisted that she continue, remarking, "You know that will feel good to you." (Doc. 13-1, Ex. C at 135). At one point Decambra, while videorecording, held W.M.'s leg up—without her permission—to position W.M. while A.R. inserted the dildo. Neither W.M. nor A.R. wanted to engage in the sexual activity in Decambra's presence, and both of them verbalized to each other that they did not like what was taking place. W.M. and A.R. testified that they felt forced to comply with Decambra's commands because he was an authority figure, he overcame any dissent W.M. expressed with insistence, and they feared his rebuke. When Decambra finished his recording, he ordered W.M. not to tell anyone about either incident. Two days, later, W.M. told a caregiver and her mother.

W.M. elaborated during her trial testimony that every time she voiced dissent—"no, I don't want to do it,"—Decambra argued with her until she submitted.

W.M. feared that if she refused to comply with Decambra's commands he would become angry and shame her. W.M. had been in a wheelchair her whole life and hated the feeling of being demeaned.

In Leon County Circuit Court Case No. 2009-CF-831, Decambra was charged with five crimes: two counts of Lewd and Lascivious Battery Upon a Disabled Person—A.R. (Counts I and II); one count of Lewd and Lascivious Battery Upon a Disabled Person—W.M. (Count III); one count of Exploitation of a Disabled Adult—A.R. (Count IV); and another count of Exploitation of a Disabled Adult—W.M. (Count V). (Doc. 13-1, Ex. A at 10-11).[8] The jury found Decambra guilty of all counts as charged. (Doc. 13-1, Ex. A at 64-68).

The trial court adjudicated Decambra guilty and sentenced him to a total term of 30 years of imprisonment followed by 15 years on sex offender probation. (Doc. 13-1, Ex. A at 75-84). The Florida First District Court of Appeal ("First DCA") affirmed the judgment on April 26, 2012, *per curiam* and without written opinion.

---

[8] Citations to the state court record are to the electronically-filed exhibits attached to the State's answer (Doc. 13). The court cites the attachment number followed by the lettered exhibit and the page number appearing on the original document. If a page of a document bears more than one page number, the court cites the Bates stamp number appearing at the bottom right corner of the page.

*Decambra v. State*, 96 So. 3d 885 (Fla. 1st DCA 2012) (Table) (copy at Doc. 13-1, Ex. I).

On June 24, 2013, Decambra filed a counseled motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 13-1, Ex. J at 1-38). The state circuit court denied relief after an evidentiary hearing. (Doc. 13-1, Ex. J at 65-226 (Evidentiary Hr'g Tr.); Ex. J at 52-62 (Order)). The First DCA affirmed, *per curiam*, in a citation opinion. *Decambra v. State*, 200 So. 3d 783 (Fla. 1st DCA 2016) (copy at Doc. 13-9, Ex. T). The mandate issued October 25, 2016. (Doc. 13-9, Ex. V). On January 24, 2017, Decambra filed a *pro se* petition for a writ of certiorari in the Supreme Court of the United States. (Doc. 13-9, Ex. W). The Supreme Court denied the petition on October 2, 2017. (Doc. 13-9, Ex. Z).

On October 4, 2016, Decambra, proceeding *pro se*, filed a second Rule 3.850 motion, which he supplemented. (Doc. 13-9, Ex. AA at 13-23 (Original Mot.); Ex. AA at 6-11 (Supp.)). The state circuit court denied relief. (Doc. 13-9, Ex. AA at 99-149). The First DCA affirmed *per curiam* and without written opinion. *Decambra v. State*, 279 So. 3d 630 (Fla. 1st DCA 2019) (Table) (copy at Doc. 13-9, Ex. BB). The mandate issued October 1, 2019. (Doc. 13-9, Ex. DD).

On March 20, 2019, Decambra filed a *pro se* petition for writ of habeas corpus in the state circuit court. (Doc. 13-9, Ex. EE at 3-15). The state circuit court treated

the petition as a motion for postconviction relief under Florida Rule 3.850, and denied the motion. (Doc. 13-9, Ex. EE at 16). The First DCA affirmed *per curiam* and without written opinion. *Decambra v. State*, 286 So. 3d 736 (Fla. 1st DCA 2020) (Table) (copy at Doc. 13-9, Ex. HH). The mandate issued February 4, 2020. (*Id.*).

Decambra filed his counseled federal habeas petition on October 10, 2019. (Doc. 1). Decambra's amended petition raises four claims of ineffective assistance of trial counsel. (Doc. 3). The State asserts that all of Decambra's claims fail on the merits. (Doc. 13).

## II.   RELEVANT LEGAL PRINCIPLES

### A.   Section 2254 Standard of Review

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[9] Justice O'Connor described the appropriate test:

---

[9] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia)

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

---

in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under

AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.</u>

*Richter*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## B.    Federal Law Governing Claims of Ineffective Assistance of Counsel

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and

courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take."). "Because of this burden, when the evidence is unclear . . ., [courts] presume counsel performed reasonably and exercised reasonable professional judgment." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citations omitted).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different trial outcome. *See Strickland*, 466 U.S. at 694. A

reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III.    DISCUSSION

**Ground One**    **"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (_Strickland_) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to include a critical argument for judgment of acquittal on count five of the felony information." (Doc. 3 at 10).**

Count V of the information charged Decambra with exploiting W.M. by knowingly, unlawfully and by deception or intimidation, obtaining or using her debit card to buy KY Jelly. Decambra claims that his trial counsel, Adam Ruiz, was ineffective during his argument for a judgment of acquittal because Ruiz focused only on the lack of evidence of deception or intimidation, and failed to argue that there also was no evidence that _he_ (as opposed to A.R.) used W.M.'s debit card to purchase the KY Jelly. (Doc. 3; Doc. 7).[10] Decambra maintains that the state court

---

[10] The elements of Exploitation of a Disabled Adult, as stated in the jury instructions, are:

1.    Decambra did knowingly, unlawfully and by deception or intimidation, obtain, use, endeavor to obtain or endeavor to use funds, assets or property of W.M.

2.    He did so with intent to, either temporarily or permanently, deprive W.M. of her right to the property or any benefit from it or to appropriate the property of W.M. to his own use or to the use of any person not entitled to it.

unreasonably applied *Strickland* when it found that Ruiz's failure to make this argument was a reasonable tactical decision. (Doc. 7 at 20-21). Decambra concludes that "[t]he prejudice flowing from the failure to make the JOA motion is obvious" because "[a] successful JOA motion would have resulted in acquittal on Count V." (*Id*. at 21).

The parties agree that Decambra exhausted his state remedies by presenting this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 12-13; Doc. 13 at 27). The State asserts that Decambra is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. (*Id*. at 27-32).

A.     **State Court's Decision**

Decambra presented this claim to the state courts as Ground II of his first Rule 3.850 motion. The state circuit court conducted an evidentiary hearing and denied relief. The circuit court's order included the following findings of fact and analysis:

> 3.     This Court conducted an evidentiary hearing on January 16, 2015. Mr. Decambra testified on his own behalf. Also testifying were his spouse Pamela Decambra; his son Brian Decambra; Tanye Neal; Antionette McDonald and defense counsel, Adam Ruiz.

---

3.     W.M was a disabled adult under the definition provided in the jury instructions.

(Doc. 13-1, Ex. A at 51-52 (Jury Instr.)); Fla. Stat. § 825.103 (2008).

Page 21 of 82

4.      Pamela Decambra took the stand and testified that the alleged victim A.R. was "part of the family." She further testified that at the time of the alleged incident Mr. Decambra was no longer employed as A.R.'s life coach by the State of Florida (Mr. Decambra was apparently unemployed in 2008). She testified at the time of the alleged incidents he was only helping out the alleged victim as a friend or volunteer. Mrs. Decambra testified that the two victims (W.M. and A.R.) were engaged to be married at one point, she testified as to the representation provided by attorney Ruiz and offered testimony regarding meetings between her husband and attorney Ruiz, and the investigations undertaken on behalf of her husband by "3rd Eye Investigations, Inc."

      She offered specific testimony regarding the exclusion of family members from the courtroom when the victims testified. While she indicated that attorney Ruiz "knew I wanted to stay in the courtroom" she did not indicate that any formal request was made to Counsel or to the Court. She asserted defense counsel showed up for trial with no file and only a blank notepad. She felt family members of A.R. shielded the alleged victim from her at the courthouse. She denied her husband appeared for a meeting with defense counsel while abusing alcohol, she denied that her husband ever changed his story, she denied a plea offer was ever recommended or that her husband had rejected a five-year plea offer. She did indicate that attorney Ruiz informed her that he had turned down a five-year plea offer because the "case was going to get dismissed".

5.      Brian Decambra testified that he had known the alleged victim A.R. since he was nine years old and that he was "like family." He testified that there were numerous meals eaten together at the Decambra house. He also recounted that alleged victim called the witnesses [sic] mother "Mom." He related how the family was excluded from the courtroom during the victims [sic] testimony and that he "would have rather stayed" in the Courtroom. He testified that he never asked to stay in the

courtroom and indicated that he did not know that remaining was an option.

He described his father as working as a volunteer with the alleged victim in 2008. Young Mr. Decambra admits that he never told attorney Ruiz that he wanted to stay in the courtroom during victim testimony.

6.      Tanye Neal also took the stand. She is an individual who works with the disabled and knew both alleged victims, having performed housekeeping services for both. She described finding nude photos of the alleged female victim (W.M.) in the alleged male victim's (A.R.) apartment. She instructed A.R. to put those images in a safe place. These were apparently <u>not</u> the photos (or all of the photos) introduced at trial but were images allegedly taken by victim A.R. Although Ms. Neal appeared at Court, she was never called to testify. She indicates that attorney Ruiz was aware that she was present at trial. She was further aware that the Defendant had allegedly taken pictures of the two victims in the shower but she never saw the photographs taken by the Defendant.

7.      The Defendant, Francis Xavier Decambra, testified on his own behalf. At the time of the hearing he was apparently on some medication for panic disorder but his demeanor and comportment were appropriate and he appeared competent. He testified extensively as to the nature and condition of A.R. (the alleged male victim) and his disabilities or lack thereof. The Defendant painted a picture of A.R. as a competent young man capable of driving and other activities and an individual who "came and went as he pleased."

Mr. Decambra believed that A.R. had been nervous about testifying and would have been nervous with the Decambra family being in the Courtroom. He was clear that at the time of the alleged incident he was no longer operating as a paid life coach but was providing the same services [in] a volunteer capacity, essentially helping a friend.

Page 23 of 82

Mr. Decambra stated that the alleged victim, W.M., had no mental disability. Hers instead was a physical disability due to cerebral palsy. He denies that she was ever his client.

Mr. Decambra testified that the alleged victims were deposed on the first day of trial. He maintains that at times prior to trial his attorney told him that the "state was dropping the charges". He joined in Mrs. Decambra's assertion that Mr. Ruiz showed up for trial carrying only a blank pad of paper and a pen. He denied that the depositions of the victims were ever discussed with him. He asserts that he wanted his family present in trial when the victims testified. On cross-examination he discussed an alleged five-year offer, the State dropping charges and the fact that he was not a US citizen and could face deportation based on the charges.

Mr. Decambra asserted that he could have appropriately had sex with the alleged victim (A.R.) if he was "no longer a client" but he also denied having any sexual encounter with the victim W.M. Decambra recognized that W.M. did testify that what she did was not consensual and he conceded her physical disability. He did admit to an incident involving alcohol use at a meeting with his lawyer but stated normally he drank Diet Coke.

8.          Antoinette McDonald was called as a witness on behalf of the State. At the times material she served as Mr. Ruiz's legal assistant. She testified with regard to some meetings between Attorney Ruiz and his client. She also testified as to her presence during the victim testimony at trial. Although the family was excluded, she was not. The focus of her testimony was rather narrow.

9.          Attorney Adam Ruiz testified extensively. His testimony touched on his background as an experienced criminal defense lawyer, his meetings and work with the Defendant including the alcohol incident (which Defendant asserted wouldn't happen again and apparently did not). Mr. Ruiz denied the State _ever_

made a five-year offer. He indicated that he would have had to pass on such an offer on [sic] because it would have been difficult to impossible for the Defendant to accept the plea without deportation. He discussed his overall trial strategy and the possibility of a rule 3.190(c)(4) issue. Counsel's concern was that he believed that the alleged victim A.R. was perfectly able to consent, but that his client Mr. Decambra absolutely denied the contact, so he could not file the appropriate motion.

Mr. Ruiz denied that he was ever told by Assistant State Attorney John Hutchins [t]hat the case was going to be dismissed. He testified regarding the victim A.R.'s relationship with A.R.'s father and his cross-examination of the father relating to any alleged disability. Mr. Ruiz did not recall the Defendant insisting that the family be in the courtroom during the victims [sic] testimony and he did not recall the family members requesting that they be in the courtroom during the victims [sic] testimony.

His testimony touched on the various grounds asserted by the Defendant. He explained his arguments regarding the motion for judgment of acquittal, the evidence relating to purchases on the debit or credit card, his evaluation of the Defendant's status (having been a paid assistant living coach and subsequently performing the same services as a volunteer)[,] his extensive meetings with the Client on weekends, his evaluation of the changing timelines presented by the Defendant; his consideration and rejection of any potential "reverse Williams rule" evidence; the allegations that he failed to prepare for trial and appeared with a blank notepad and pen. He described extensive trial preparations; he testified as to the reasons for the timing of the depositions of the victims, his general strategy relating to not deposing victims, the investigation performed by 3rd Eye Investigations, Inc., the photographs introduce[d] a[t] trial which the defendant had admitted taking, and the possibility that there might be other victims[.]

The Court further notes that a proffer was made by counsel for Decambra regarding some professional difficulties Attorney Ruiz is alleged to have had recently. This Court allowed the Defense to explore the issue as to whether any of those allegations temporally related to the matters currently before this Court. As this Court announced during the January 2015 hearing, this Court finds that any current difficulty is <u>not</u> temporally related to the issues before this Court and in this Court will not comment further on those alleged issues.

Attorney Ruiz testified extensively with regard to strategy relating to disability issues and his argument that the statute did not apply. The jury was clearly apprised that in spite of his disability designation, that A.R. could drive, go on cruises, engage in relationships, make decisions with regard to relationships and was capable of consent. Mr. Ruiz <u>never</u> conceded mental disability on the part of either victim but he properly conceded that W.M. was <u>physically</u> disabled.

Attorney Ruiz felt that there was no reason to believe the testimony of either victim would have been different [i]f the family [had] been in the courtroom. This Court finds there were no conflict issues at the time of trial and that his tactical decisions made throughout the trial were consistent with his best efforts.

Attorney Ruiz testified that at the conclusion of the case, that he was disappointed with the sentence, and that he believed it to be "over the top and excessive."

The Court, having reviewed the testimony presented at the hearing and having considered all the evidence and the applicable law finds that as to Grounds II through VI that the Motion of the Defendant is not well taken and does not meet the criteria established in *Strickland v. Washington*, 466 U.S. 688 (1984), and the cases following it on the issue of effective representation of a client.

This Court finds that there were rational tactical decisions made by attorney Ruiz as to Grounds II through VI, and further the Court

does not find that said attorney was deficient in making said decisions. Tactical decisions such as these are not subject to collateral attack. See *Wilson v. Wainwright*, 474 So. 2d 1162 (Fla. 1985) and *Remeta v. Dugger*, 622 So. 2d 452 (Fla. 1993). This Motion, as it relates to grounds II through VI is DENIED.

As to Ground VII, Mr. Decambra alleges that trial counsel was ineffective in failing to properly prepare for trial. This Court has reviewed the testimony offered on behalf of Mr. Decambra and finds said testimony to lack credibility when contrasted with the testimony offered by the State, including the testimony of attorney Ruiz, as well as that of his assistant, and this Court's review of the trial transcripts.

Accordingly, this Court finds that asserted Ground VII fails to establish that attorney Ruiz's performance was deficient and having found no deficiency, it follows that there was no prejudice to Mr. Decambra. The two prong test set forth in *Strickland*, having not been satisfied, the motion as it relates to Ground VII is DENIED.

(Doc. 13-1, Ex. J at 53-60).[11] The First DCA affirmed in a citation opinion:

AFFIRMED. *See* Carratelli v. State, 961 So.2d 312 ([Fla.] 2007); Hobbs v. State, 820 So.2d 347 (Fla. 1st DCA 2002); Purvis v. Crosby, 451 F.3d 734 (11th Cir. 2006).

(Doc. 13-9, Ex. T).

---

[11] The undersigned has not included the state court's analysis of Ground I of Decambra's Rule 3.850 motion, because that claim is not raised in his federal habeas petition. Ground I of Decambra's Rule 3.850 motion alleged that Ruiz was ineffective regarding Decambra's family being excluded from the courtroom during the victims' testimony. (Doc. 13-1, Ex. J at 18-23).

### B.    Decambra's Claim Does Not Warrant Habeas Relief

The First DCA's summary affirmance is an "adjudication on the merits" of Decambra's claim, and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary); *id*. at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Neither the First DCA's opinion, nor the cases cited therein, explains the court's reasoning for rejecting Decambra's claim that Ruiz was ineffective in arguing for a judgment of acquittal on Count V. The three cases cited in the opinion address Decambra's argument on a different claim—one not raised here—that trial counsel was ineffective regarding Decambra's family being excluded from the courtroom during the victims' testimony.[12]

---

[12] Decambra argued in his postconviction appeal that because the closure of the trial was structural error, prejudice should be presumed and he should not be required to satisfy *Strickland*'s actual prejudice standard. The First DCA's citation to *Carratelli*, *Hobbs* and *Purvis* addressed that argument.

Accordingly, this court presumes that the First DCA adopted the circuit court's reasoning. *See Wilson v. Sellers*, ___ U.S. ___, 138 S. Ct. 1188, 1192 (2018) (holding that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

In reviewing the state court's decision, this court defers to the state court's factual findings, because they are amply supported by the record and because Decambra has not rebutted them with clear and convincing evidence to the contrary. *See Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence." (citing 28 U.S.C. § 2254(e))). This deference extends to the state court's implicit finding that Ruiz's evidentiary hearing testimony was credible. Eleventh Circuit precedent requires this deference. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review. Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been

Page 29 of 82

observed by the state trial court, but not by them.'" *Consalvo*, 664 F.3d at 845
(quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)).

Given the state court's findings and the trial record, there is a reasonable
argument that Ruiz's performance satisfied *Strickland*'s deferential standard. At
trial, Ruiz argued with regard to Count V:

> The last two counts, I think, are clearly insufficient. There has
> been absolutely no evidence, in either Count IV or Count V, that money
> was taken through deception or intimidation, which is what the law
> requires.
>
> What we have here at most is a petty theft at most, because to get
> beyond the petty theft, the State had to prove that money was taken
> through deception or intimidation, and that simply did not occur.
>
> We know that the purchase at Publix—under the State's theory
> of events, there was K-Y Jelly taken or paid for with [W.M.]'s debit
> card, but there was no deception or intimidation used to make that
> purchase. It was a theft at most. It was fraudulent use of a credit card at
> most. Once again, the State did not charge that.
>
> It's not enough to make this a strict liability crime, Your Honor,
> and to say that because the State has introduced evidence showing the
> State of Florida has labeled them disabled, it automatically means
> anything taken from them is exploitation of a disabled adult. They
> simply have not proven that whatsoever. At most we have a petty theft.
>
> I would argue, in fact, though, once again to argue that same
> point, is that, you know, the issue becomes whether or not, you know,
> [A.R.] or [W.M.] is disabled. But at most—at most, there is a—a petty
> theft on Count V, at most Count IV, with respect to the Kay Jeweler
> account and the Best Buy account.

(Doc. 13-1, Ex. E at 278-79).

Decambra faults Ruiz for failing to argue that "[t]he State's evidence was insufficient to demonstrate that it was the Petitioner who obtained, used, or endeavored to use or obtain W.M.'s funds" to buy the KY Jelly. (Doc. 3 at 11).

A motion for judgment of acquittal tests the legal sufficiency of the evidence, not the weight of the evidence. *See Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981). "A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the [State] that a jury might fairly and reasonably infer from the evidence." *Lynch v. State*, 293 So. 2d 44, 45 (Fla. 1974). All evidence supporting the trial court's decision, even erroneously admitted evidence, is to be considered for purposes of determining legal sufficiency. *Lewis v. State*, 754 So. 2d 897, 902 (Fla. 1st DCA 2000); *Barton v. State*, 704 So. 2d 569, 573 (Fla. 1st DCA 1997). The Florida Supreme Court has emphasized that "courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the [State] can be sustained under the law." *Id*.

A reasonable attorney in Ruiz's position could decide that Decambra's proposed argument was futile, given the JOA standard and the victims' testimony. W.M. testified that (1) Decambra told her she needed to have her bandage changed and offered to buy bandages; (2) she gave Decambra permission to use her debit card

Page 31 of 82

to buy bandages; (3) the only item she authorized Decambra to purchase was bandages; (4) she did not give Decambra permission to purchase KY Jelly; and (5) Decambra used her debit card to purchase KY Jelly. (Doc. 13-1, Ex. C at 68-69). A.R.'s testimony confirmed that (1) W.M. authorized Decambra to use her debit card only to buy bandages; (2) W.M. did not give Decambra permission to buy anything else with her card; and (3) he and Decambra went to Publix and purchased bandages and KY Jelly with W.M.'s card. (*Id*. at 129-30).

When the trial court denied the motion for JOA on Count V, he expressly found that a jury reasonably could infer from the victims' testimony that *Decambra* obtained W.M.'s card and used it to purchase the KY Jelly. (Doc. 13-1, Ex. D at 298-304).

Counsel is not ineffective for failing to make a weak, if not meritless, argument. *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."); *Freeman v. Attorney Gen., Fla.*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim."); *Bolender v. Singletary*, 16 F.3d 1547, 1473 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

Decambra also cannot establish prejudice in light of the trial court's explicit finding in the State's favor on the issue Ruiz allegedly failed to press. The state court reasonably applied the *Strickland* standard in rejecting Decambra's claim. Decambra is not entitled to habeas relief on Ground One.

| | |
|---|---|
| **<u>Ground Two</u>** | **<u>"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (*Strickland*) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to object to improper testimony that the State of Florida had evaluated the alleged victims and determined that they were "disabled persons" and were entitled to state-provided services, a matter that invaded the province of the jury." (Doc. 3 at 13-14).</u>** |

Decambra claims that Ruiz was ineffective for failing to object to testimony that W.M. and A.R. were classified by the State of Florida as "disabled" for purposes of receiving services from the Agency. Decambra argues that the testimony was improper because it invaded the province of the jury and falsely led the jury to believe that any adult who qualified as "disabled" for purposes of receiving Agency services was a "disabled adult" who "lack[ed] the capacity to consent" under the criminal statute. Decambra also claims that "[t]he prosecution additionally argued to the jury that this prior evaluation and determination satisfied the 'disability' and 'lack of capacity to consent' elements in the underlying applicable criminal statute." (Doc. 3 at 14).

For context, Florida defines the crime of Lewd or Lascivious Battery on a

Disabled Person as follows:

> (2)(a) "Lewd or lascivious battery upon an elderly person or disabled
> person" occurs when a person encourages, forces, or entices an elderly
> person or disabled person to engage in sadomasochistic abuse, sexual
> bestiality, prostitution, or any other act involving sexual activity, when
> the person knows or reasonably should know that the elderly person or
> disabled person either lacks the capacity to consent or fails to give
> consent.

Fla. Stat. Ann. § 825.1025(2)(a) (2008); *see also* Doc. 13-1, Ex. A at 44-47 (Jury

Instr.).

> For purposes of Section 825.1025, a "disabled adult" is defined as:

> a person 18 years of age or older who suffers from a condition of
> physical or mental incapacitation due to a developmental disability,
> organic brain damage, or mental illness, or who has one or more
> physical or mental limitations that restrict the person's ability to
> perform the normal activities of daily living.

Fla. Stat. Ann. § 825.101(3) (2008); *see also* Doc. 13-1, Ex. A at 45 (Jury Instr.).[13]

> For purposes of Section 825.1025, "lacks capacity to consent" is defined as

follows:

> (8) "Lacks capacity to consent" means an impairment by reason of
> mental illness, developmental disability, organic brain disorder,
> physical illness or disability, chronic use of drugs, chronic intoxication,
> short-term memory loss, or other cause, that causes an elderly person

---

[13] This definition of "disabled adult" applies also to the exploitation offenses charged
in Counts IV and V. *See* Fla. Stat. § 825.103 (2008); *see also* Doc. 13-1, Ex. A at
51-52 (Jury Instr.).

> or disabled adult to lack sufficient understanding or capacity to make
> or communicate reasonable decisions concerning the elderly person's
> or disabled adult's person or property.

Fla. Stat. Ann. § 825.101(8) (2008); *see also* Doc. 13-1, Ex. A at 45 (Jury Instr.).

The parties agree that Decambra exhausted his state remedies by presenting this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 15-16; Doc. 13 at 33). The State asserts that Decambra is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. (*Id.* at 33-41).

## A.    State Court's Decision

Decambra presented this claim to the state courts as Ground III of his first 3.850 motion. The state circuit court conducted an evidentiary hearing and denied relief for the reasons quoted above. The First DCA affirmed in a citation opinion.

## B.    Decambra's Claim Does Not Warrant Habeas Relief

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not provide a reasoned opinion concerning this particular claim, this court presumes that the First DCA adopted the state circuit court's reasoning. *Wilson*, 138 S. Ct. at 1192.

The state court determined that Ruiz's failure to object was a reasonable tactical decision, and that Decambra failed to demonstrate he was prejudiced by Ruiz's failure to object.[14] A fairminded jurist could agree with these conclusions.

Neither the prosecutor, nor any witness, led the jury to believe that W.M.'s and A.R.'s classification as "disabled" for purposes of receiving Agency services satisfied the "disabled adult" and "lack of capacity to consent" elements of the criminal statute. To the contrary, the prosecutor emphasized during opening statements that one of the elements the State had to prove was that A.R. and W.M. were "disabled adults" under the criminal statute, and that the judge would provide them the definition of "disabled adult" in the jury instructions. (Doc. 13-1, Ex. C at 35-36). The prosecutor then read to the jury the statutory definition of "disabled adult" provided in Fla. Stat. § 825.101(3). (Doc. 13-1, Ex. C at 35-36). The prosecutor argued that the jury would conclude that W.M. and A.R. were "disabled adults" after hearing their testimony and observing them. (*Id*. at 36).

When the prosecutor questioned W.M. about the State having classified her as disabled, it was in the context of explaining why she received the services of a supportive living coach from the Agency, and the nature of Decambra's position.

---

[14] Although the state circuit court provided a detailed discussion only of *Strickland*'s performance prong, it also stated that Decambra failed to satisfy both prongs of the *Strickland* standard. (Doc. 13-1, Ex. J at 59).

(Doc. 13-1, Ex. C at 41-42). The same is true of the prosecutor's questioning of A.R. and the support coordinator for the Agency (Dquan Brigham). (*Id*. at 103, 158-59 (A.R. Test.); Ex. D at 195-202 (Brigham Test.)).[15] A reasonable attorney could have decided that there was no basis to object to this testimony. The testimony that W.M. and A.R. were classified by the State of Florida as "disabled" for purposes of receiving Agency services was relevant to explain Decambra's relationship with the victims, how and why he became involved with them, how their relationship developed, and the nature of their relationship.

In closing arguments, the prosecutor told the jury that their determination of whether the victims were disabled, and whether either or both of them lacked the capacity to consent, must be guided by the definitions provided in the jury instructions. (Doc. 13-1, Ex. E at 343). The prosecutor quoted the statutory definition of "disabled adult" provided in Section 825.101(3). (Doc. 13-1, Ex. E at 346-47).

In rebuttal closing argument, the prosecutor reiterated to the jurors that they must rely exclusively on the jury instructions to determine if the elements of each crime were met, including the definitions of "disabled adult" and lacking capacity

---

[15] Brigham testified that he was responsible for finding providers of services for clients of the Agency, including helping individuals with disabilities find a supportive living coach. Brigham also described Decambra's role as a supportive living coach for A.R. and W.M. (Doc. 13-1, Ex. D at 195-202).

to consent. (*Id*. at 370). The jury instructions repeated, verbatim, the statutory definitions provided in Fla. Stat. §§ 825.101(3) and 825.101(8). (Doc. 13-1, Ex. E at 379-80 (Trial Tr.), Doc. 13-1, Ex. A at 45 (Jury Instr.)). On this record, a fairminded jurist could concur in the state court's conclusion that Ruiz's failure to make Decambra's proposed objection was not deficient performance.

The state court also was reasonable in concluding that Decambra failed to satisfy *Strickland*'s prejudice prong. Given the relevance and probative value of the testimony at issue, the other evidence of W.M.'s and A.R.'s disabilities (independent of the testimony that they were classified as disabled for purposes of receiving Agency services), the prosecutor's clarifying arguments, and the jury instructions, there is no reasonable probability the result of Decambra's trial would have been different had Ruiz objected. *See Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

The state court's rejection of Decambra's claim did not involve an unreasonable application of the *Strickland* standard. Decambra is not entitled to federal habeas relief on Ground Two.

**Ground Three**      **"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (*Strickland*) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to object to improper testimony and impermissible references by state witnesses that, at the time of the alleged**

**offenses, Petitioner was a supported living coach, employed
by the State of Florida and assigned to provide services to the
alleged victims as disabled persons." (Doc. 3 at 17).**

Decambra alleges that Ruiz was ineffective for failing to object to testimony
and inferences that he was *employed* as A.R.'s and W.M.'s supportive living coach
at the time of the crimes. (Doc. 3 at 17-18; Doc. 7 at 26-29). Decambra claims that
he was not employed by the Agency at the time of the crimes, and that Ruiz was
aware of that fact. Decambra asserts that as a result of Ruiz's failure to object, the
State "permeate[d] Petitioner's trial with verifiably false and inherently prejudicial
testimony that he was on the job at the time of the alleged offenses, was violating an
employment policy and abusing and exploiting his clients, and was otherwise acting
in violation of ethical standards imposed upon him through his job." (Doc. 3 at 18).

The parties agree that Decambra exhausted his state remedies by presenting
this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 19-20;
Doc. 13 at 42). The State asserts that Decambra is not entitled to habeas relief
because he fails to satisfy § 2254(d)'s demanding standard. (*Id*. at 42-47).

A.    **State Court's Decision**

Decambra presented this claim to the state courts as Ground IV of his first
3.850 motion. The state circuit court conducted an evidentiary hearing and denied
relief for the reasons quoted above. The First DCA affirmed without explanation.

Page 39 of 82

## B.    Decambra's Claim Does Not Warrant Habeas Relief

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not provide its reasoning for rejecting this particular claim, this court presumes that the First DCA adopted the state circuit court's reasoning. *Wilson*, 138 S. Ct. at 1192.

In reviewing the state court's reasoning, this court defers to the state court's factual findings because they are amply supported by the record and because Decambra has not rebutted them with clear and convincing evidence to the contrary. As noted above, this deference extends to the state court's implicit finding that Ruiz's evidentiary hearing testimony was credible. *Consalvo.*, 664 F.3d at 845; 28 U.S.C. § 2254(e).

Attorney Ruiz testified that (1) Decambra initially was a paid supportive living coach for A.R., and (2) at some point in time the employment aspect ended but Decambra kept working as A.R.'s supportive living coach on a volunteer basis. (Doc. 13-1, Ex. J at 154-55). In response to the allegation that he was ineffective for failing to object to inferences that Decambra was *employed* as a supportive living coach, Ruiz explained that whether Decambra was being paid versus volunteering

did not matter because Decambra still was functioning as a supportive living coach coordinated through the Agency. (*Id*. at 155).

The trial transcript supports the state court's conclusion that Ruiz's failure to object was neither unreasonable nor prejudicial. At trial, the prosecutor did not argue, and no witness testified, that Decambra was a paid, as opposed to volunteer supportive living coach at the time of the crimes. (Doc. 13-1, Exs. C-E). Mr. Brigham, the support coordinator for the Agency, testified that he was responsible for finding providers for services needed by disabled individuals under the Florida Medicaid Waiver Program, and that he helped individuals with disabilities find a supportive living coach. (Doc. 13-1, Ex. D at 196). Brigham did not distinguish between employed and volunteer supportive living coaches, and did not testify or imply that Decambra was paid or employed by the State of Florida. Brigham explained that supportive living coaches receive training from the Agency, including ethics training. For example, the are trained that it is a "big no-no" for a supportive living coach to use a client's funds for personal purchases. (*Id*. at 199). In June of 2008, Decambra was serving as A.R.'s supportive living coach through the Agency. (*Id*. at 197).

As to W.M., Brigham testified that (1) he was involved in coordinating Decambra's services as a supportive living coach for W.M. because W.M.'s coach

was retiring; (2) one of Brigham's duties was to set up interviews of potential supportive living coaches; and (3) W.M. had requested that Decambra be her supportive living coach. (*Id*. at 198-200). The meeting at W.M.'s home on June 23, 2008, was to coordinate Decambra serving as W.M.'s supportive living coach. (*Id*. at 199-200, 202).

On this record, a fairminded jurist could conclude that Decambra's proposed objection lacked merit, and that Ruiz's failure to make it was not deficient performance. *Pinkney*, 876 F.3d at 1297; *Meders v. Warden, Georgia Diagnostic Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained."); *Freeman v. Attorney Gen., Fla*., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim.").

A fairminded jurist also could conclude that Decambra failed to satisfy *Strickland*'s prejudice standard. Not only did Decambra's proposed objection lack merit, he also failed to establish at the postconviction evidentiary hearing that his status as a volunteer versus paid supportive living coach had any effect on the charges in this case, his defense, or his relationship with either victim.

The state court's rejection of Decambra's claim was based on a reasonable determination of the facts and a reasonable application of the *Strickland* standard. Decambra is not entitled to habeas relief on Ground Three.

| | |
|---|---|
| **<u>Ground Four</u>** | **<u>"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (*Strickland*) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to highlight to the jury numerous inconsistencies and deficiencies in the state's evidence at trial." (Doc. 3 at 20).</u>** |

Decambra alleges that Ruiz was ineffective for failing to more aggressively challenge A.R.'s and W.M.'s credibility by emphasizing "significant inconsistencies" in their testimony that "would not have been readily apparent to the jury." (Doc. 3 at 20-21). Decambra identifies four inconsistencies:

•    The Wife said the Petitioner told the Husband to take off his clothes. The Husband, however, said that the Petitioner **did not** tell him to do that; he did it on his own.

•    The Wife said she told the Petitioner to stop taking pictures of their sexual activity. The Husband, however, said that the Wife **didn't** tell the Petitioner to stop; he said that "everyone was having fun."

•    The Wife stated that she and Petitioner "kind of got into it a little Bit" over her not wanting him to change a dressing on her leg, and that he then became very angry when he learned she had called her doctor's office to see whether they would send someone to change the dressing for her. The Husband testified that the **Petitioner was not upset** at all with her for making that call and had instead offered to drive her to her doctor's office.

•      The Wife said the Petitioner and the Husband left twice to go to the store that was the subject of Count V. The Husband said it was just one trip.

(Doc. 7 at 30-31) (emphasis in original).[16]

The parties agree that Decambra exhausted his state remedies by presenting this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 21-22; Doc. 13 at 47). The State asserts that Decambra is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. (*Id.* at 48-50).

## A.    State Court's Decision

Decambra presented this claim to the state courts as Ground V of his first 3.850 motion. The state circuit court conducted an evidentiary hearing and denied relief for the reasons quoted above. The First DCA affirmed.

## B.    Decambra's Claim Does Not Warrant Habeas Relief

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not explain its reasoning for rejecting this claim, this court presumes that the First DCA adopted the state circuit court's reasoning. *Wilson*, 138 S. Ct. at 1192.

---

[16] Again, habeas counsel's labelling of the victims as "Wife" and "Husband" misstates the evidence found in the record.

A fairminded jurist could agree with the circuit court's conclusion that Ruiz's strategic decisions concerning how best to challenge the victims' credibility satisfied *Strickland*'s deferential standard. Decambra's defense was that A.R. was not disabled, that the sexual activity between W.M. and A.R. in Decambra's presence was consensual, and that neither victim lacked the capacity to consent. (Doc. 13-1, Ex. J at 176-77 (Ruiz's Postconviction Evid. Hr'g Test.); Doc 13-1, Ex. E at 271-80, 294-96, 352-64 (Ruiz's Mot. for J. of Acquittal and Closing Arg.)). To that end, Ruiz elicited the following admissions from W.M. during cross-examination: (1) her cerebral palsy had no impact on her mental faculties, (Doc. 13-1, Ex. C at 81); (2) she could have asked Decambra to leave—or could have asked A.R. to ask Decambra to leave—but she did not, (*id*. at 82-83); (3) she had access to a phone and could have called someone when Decambra and A.R. went shopping on June 23, 2008, but she did not try to contact anyone, (*id*. at 84-85); (4) Decambra never threatened W.M. verbally or physically, (*id*. at 85, 93); (5) W.M. had a high school diploma and had taken college courses, (*id*. at 87); (6) W.M. and A.R. had been to the sex toy store before, (*id*. at 88); and (7) W.M. was upset at the increased amount of time A.R. had been spending with Decambra because it diminished her time with A.R. (*Id*. at 80-81).

When Ruiz cross-examined A.R., he emphasized that A.R. (1) graduated from high school, (2) had been granted a driver's license, (3) had driven from Tallahassee to Orlando by himself and stopped for food and gas along the way, (4) had bank accounts where he could withdraw money at will, (5) lived by himself, (6) paid his own electric bill (7) cleaned his apartment, (7) ordered food delivery, (8) was "fairly independent," and (9) "pretty much [made his] own decisions." (*Id*. at 140-44). Ruiz also elicited A.R.'s testimony that he never voiced to Decambra that he did not want to engage in oral sex with him and, to the contrary, affirmed to Decambra that he wanted to engage in that sexual activity. (*Id*. at 143). Ruiz also elicited A.R.'s testimony that during the sexual activity with W.M. in Decambra's presence, A.R. never told Decambra he did not want to engage in the sexual activity, and never voiced that he did not want to be photographed or videotaped. (*Id*. at 145-47). Ruiz also asked A.R. if Decambra had ever threatened him, to which A.R. responded "no." (*Id*.).

During closing argument, Ruiz emphasized the above testimony. (Doc. 13-1, Ex. E at 352-64 (Closing Arg.)).

At the postconviction evidentiary hearing, Ruiz testified that he had tried dozens of sex cases as a defense attorney by the time he represented Decambra. (Doc. 13-1, Ex. J at 147). Ruiz felt fully prepared to cross-examine the victims in

this case because he had deposed them the morning of trial. (*Id*. at 159). Ruiz

described his cross-examination strategy:

> [Y]ou have to understand that, I mean, obviously, I've tried cases
> involving five year old victims of sex cases. I've tried cases involving
> disabled victims, and obviously, it's a delicate balance between getting
> out of the witness what you need to get out of the witness and not
> alienating and ostracizing the jury. So based on what (inaudible) I feel
> like I was prepared. It was just a delicate balance in this type of a case.

(*Id*. at 159). Ruiz later confirmed:

> [O]verkill can be a bad thing with a jury trial. Overkill can make people
> angry. Reading a jury is one of the hardest things a lawyer has to do.
> Repeating certain things and shoving it down their throat sometimes
> can create problems as well. Sometimes it's better to simply hint at
> things and put things out there without having to force it on them.
>
> This case in particular, simply because you had one woman,
> [W.M.] – I'm sorry, I don't recall her last name – who was clearly
> disabled. You had [A.R.] who was, in my opinion, mildly disabled. And
> so, obviously, when you have a witness on the stand with cerebral palsy,
> perhaps you want to be kind of careful how you address certain issues
> with [A.R.]. You want to be careful how you address certain issues.

(*Id*. at 174-75).

In light of Ruiz's experience, trial strategy and actual cross-examination of

the victims, a fairminded jurist could agree with the state court's conclusion that

Ruiz's performance was not deficient, and that Decambra's noted omissions failed

to establish deficient performance or prejudice under *Strickland*. The "significant

inconsistencies" Decambra identifies are not quite as he describes. For example,

Page 47 of 82

Decambra states: "[W.M.] said the Petitioner told [A.R.] to take off his clothes. [A.R.], however, said that the Petitioner **did not** tell him to do that; he did it on his own." (Doc. 7 at 30). In context, this was A.R.'s actual statement:

Q [Prosecutor]:  Okay. Now, your clothes get wet somehow, [A.R.]?

A [A.R.]:  Yes, he sprayed me accidentally.

Q:  Okay. And what does he say to you right after he sprays you accidentally?

A:  I said, You got me wet. Well, she's wet and you are wet, so both of you all can take a shower.

Q:  Okay. Had you planned to take a shower –

A:  No, sir.

Q:  – that day when you went in there?

A:  (Nods head.)

Q:  Okay. Did he tell you to take your clothes off?

A:  No, sir. I just got wet and wanted to take off my clothes because I was wet.

Q:  Okay. But you just said that he suggested you take a shower?

A:  Yes, sir.

Q:  Okay. Now, you weren't—were you intending to take a shower when you went in to give [W.M.] her bath?

A:  No, sir. I was going to take one after he left.

Page 48 of 82

(Doc. 13-1, Ex. C at 116). A.R.'s testimony was not "significantly inconsistent" with W.M.'s testimony that Decambra soaked A.R. with the shower hose and then told him to take off his clothes and get in the shower with her. (*Id*. at 48-49).

With regard to Decambra's second alleged inconsistency—that A.R. testified that "everyone was having fun"—no such testimony appears in the trial transcript. (Doc. 13-1, Exs. C-E).

The remaining two alleged inconsistencies concerning (1) Decambra's reaction to W.M. calling her doctor's office and (2) whether Decambra and A.R. purchased the KY Jelly and sex toys during one trip or two, are insignificant given the entirety of the victims' testimony and the more significant points Ruiz brought out on cross-examination and in closing argument. The Sixth Amendment does not require perfection. *Presnell v. Warden*, 975 F.3d 1199, 1228 (11th Cir. 2020) ("Counsel must be reasonable, not perfect or unrelenting.").

The state court's rejection of Decambra's claim was a reasonable application of the *Strickland* standard. Decambra is not entitled to federal habeas relief on Ground Four.

**Ground Five**      **"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (*Strickland*) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to introduce substantial reverse-*Williams* Rule evidence." (Doc. 3 at 23).**

Page 49 of 82

This claim involves the lewd or lascivious battery counts involving Decambra encouraging, forcing or enticing A.R. and W.M. to engage in sexual activity on June 19, 2008. Decambra claims that Ruiz was ineffective for failing to present the testimony of A.R.'s former housekeeper, Tanye Neal, that she found naked pictures of W.M. in A.R.'s apartment, and that W.M. was smiling in the pictures. (Doc. 3 at 23; Doc. 7 at 31-34). Decambra alleges that Ruiz was aware of this evidence through the investigator he hired, and that Ruiz subpoenaed the housekeeper for trial but never called her to testify. Decambra argues that Neal's testimony would have supported his theory that "the photos in the shower were taken at the urging of A.R. and W.M. and that the other photos were actually taken by A.R. and W.M., themselves." (Doc. 3 at 23; Doc. 7 at 32).

The parties agree that Decambra exhausted his state remedies by presenting this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 21-22; Doc. 13 at 51). The State asserts that Decambra is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. (*Id*. at 51-54).

### A.    State Court's Decision

Decambra presented this claim to the state courts as Ground VI of his first 3.850 motion. The state circuit court conducted an evidentiary hearing and denied relief for the reasons quoted above. The First DCA affirmed.

**B.      Decambra's Claim Does Not Warrant Habeas Relief**

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not indicate its reasons for upholding the circuit court's judgment, this court presumes that the First DCA adopted the circuit court's reasoning. *Wilson*, 138 S. Ct. at 1192.

In *Rivera v. State*, 561 So.2d 536 (Fla. 1990), the Florida Supreme Court held that a defendant may introduce similar fact evidence of other crimes—called "reverse *Williams* rule evidence"—for exculpatory purposes if relevant. *Id*. at 539 (citing 90.404(2)(a), Fla. Stat. (1989)).[17] The most common context in which defendants seek to use reverse-*Williams* rule evidence is when the defendant is attempting to show that someone other than himself committed the crime for which he is charged by introducing evidence that another person with an opportunity to

---

[17] Section 90.404(2)(a) codifies the rule established in *Williams v. State*, 110 So. 2d 654 (Fla. 1959). Section 90.404(2)(a) provides:

> Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.

commit the charged crime committed a similar crime by similar methods. *See e.g.,*

*Rivera*, 561 So. 2d at 539-40; *State v. Savino*, 567 So. 2d 892, 894 (Fla. 1990).

The standard for admissibility of similar-fact evidence was articulated in *State*

*v. Savino*, 567 So. 2d 892 (Fla. 1990), as follows:

> The test for admissibility of similar-fact evidence is relevancy. When the purported relevancy of past crimes is to identify the perpetrator of the crime being tried, we have required a close similarity of facts, a unique or "fingerprint" type of information, for the evidence to be relevant. If a defendant's purpose is to shift suspicion from himself to another person, evidence of past criminal conduct of that other person should be of such nature that it would be admissible if that person were on trial for the present offense. . . . Relevance and weighing the probative value of the evidence against the possible prejudicial effect are the determinative factors governing the admissibility of similar-fact evidence of other crimes when offered by the state. These same factors should apply when the defendant offers such evidence.

*Id*. at 894 (citations omitted). The court in *Savino* emphasized that "to be relevant

similar-fact evidence of other crimes must be of such nature that it would tend to

prove a material fact in issue." *Id*.

Ms. Neal testified at the postconviction evidentiary hearing that when she

provided housekeeping services for A.R., she found naked pictures of W.M. in his

apartment. W.M. was smiling in the pictures and, in some pictures, had small flower

stickers on her face and body. (Doc. 13-1, Ex. J at 111-12). The pictures Ms. Neal

found were taken prior to the time of the crimes in this case. (*Id*. at 116).

Decambra claims that Neal's testimony would have been relevant because: "The Petitioner asserted, in defending these allegations, that the photos in the shower were taken at the urging of A.R. and W.M. and that the other photos were actually taken by A.R. and W.M. themselves." (Doc. 3 at 23; Doc. 7 at 32). Decambra explains: "The obvious proclivity of [A.R.] to take naked photos of [W.M.] (and her apparent enjoyment of the activity) would have been relevant to the issue of whether Petitioner pressured the couple to take similar photographs." (Doc. 7 at 33-34).

A fairminded jurist could concur in the state court's conclusion that Ruiz was not unreasonable for declining to attempt to introduce Neal's testimony. Ruiz testified at the postconviction evidentiary hearing that Decambra admitted to taking the photographs of W.M. and A.R. in the shower, and that he also admitted to taking some, but not all, of the remaining photographs taken in the bedroom. (Doc. 13-1, Ex. J at 161-62, 172-73). Ruiz further testified:

Q [Mr. Hutchins for the State]:   Did you ever consider introducing reverse Williams rule evidence?

A [Ruiz]:  No.

Q:  Why not?

A:  I didn't feel that it was going to be admitted. It never really even occurred to me to even consider reverse Williams rule.

Q:  Well, the cases that discuss reverse Williams rule, it usually comes in where there's a situation where there's another person who is alleged to be the perpetrator; is that correct?

. . . .

A:  Correct.

Q:  Now, in this case the defendant made certain admissions about taking pictures; is that correct?

A:  Correct.

Q:  And also using Allen's credit card; is that correct?

A:  Correct.

Q:  So there was no straw man, no third person, no other person you could point to as a defense attorney and say that was the person who did it and not my client?

A:  Not that I was aware of.

Q:  You didn't feel that that was a viable defense?

A:  No.

(*Id*. at 157-58).

The trial record confirms that Ruiz's tactical decision not to introduce Neal's testimony was reasonable. The photographs of A.R. and W.M. in the shower and having sexual intercourse on June 19, 2008, were introduced into evidence at trial. Some of the shower photographs depicted both W.M. and A.R. in the shower together. (Doc. 13-1, Ex. C at 59-60 (W.M. Test. describing photographs)).

Page 54 of 82

Similarly, some of the photographs of W.M. and A.R. engaging in sexual activity on W.M.'s bed depicted both W.M. and A.R. in the same photograph. (*Id.* at 61). A.R. testified that the camera Decambra used to photograph him and W.M. in the shower and engaging in sexual activity was his (A.R.'s) camera. (Doc. 13-1, Ex. C at 117). A.R. testified that the camera did not have a timer or delayed shutter release feature "where you could set the camera down and it will just flash and take pictures that way." (*Id.*) Rather, to operate the camera, someone had to hold it and press the button for each photograph. (*Id.*).

Given Decambra's admissions that he took some of the photographs, and in light of the fact that some of the photographs themselves depicted A.R. and W.M. in the same frame engaging in sexual activity, a reasonable attorney could conclude that Neal's testimony would not have been relevant or helpful to prove that it was A.R. and not Decambra who took the photographs. *Accord Schwab v. Crosby*, 451 F.3d 1308, 1321 (11th Cir. 2006) (counsel does not "have a duty to . . . imply[ ] facts that he knows are not true").

A reasonable attorney also could conclude that Neal's testimony was not admissible "reverse *Williams* Rule evidence" on the issue of consent. Any photographs that A.R. and W.M. took themselves in private did not have a logical tendency to prove or disprove whether A.R. and W.M consented to engage in sexual

Page 55 of 82

activity *directed by and in the presence of a third party. See, e.g., Kitchings v. State*, 291 So. 3d 181, 193-95 (4th DCA 2020) (affirming the trial court's exclusion of proposed reverse *Williams* rule evidence offered by the defense in a sexual battery prosecution; explaining the requirement of "similarity" between two incidents, and how that comes into play in a *Williams* rule analysis).

Looking through the AEDPA lens, a fairminded jurist could agree with the state court's conclusion that Ruiz's failure to present Neal's testimony was not ineffective assistance. Decambra is not entitled to habeas relief on Ground Five.

| | |
|---|---|
| **Ground Six** | <u>**"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States (*Strickland*) and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to properly prepare for trial by taking only cursory depositions of the alleged victims the very morning of trial and by then failing to utilize portions of the victim's deposition testimony to challenge their credibility at trial."**</u> **(Doc. 3 at 25-26).** |

Decambra claims that Ruiz was ineffective for waiting until the morning of trial to depose the victims. Decambra notes that this "gave no time for counsel to consult with his client . . . in order to relay what was said by these critical witnesses . . . such that he might offer thoughts or point out inconsistencies himself." (Doc. 3 at 26-27). Decambra identifies one inconsistency that Ruiz should have highlighted: A.R. testified in his deposition that there was only one occasion where he and the

Petitioner engaged in oral sex, whereas he previously alleged, in a recorded statement to police, that they engaged in oral sex on four or more separate occasions including at different locations. (Doc. 3 at 27). A.R. testified at trial that the pornographic-movie-followed-by-oral-sex incidents occurred three or four times. (Doc. 13-1, Ex. C at 113).

The parties agree that Decambra exhausted his state remedies by presenting this claim to the state courts in his first Rule 3.850 proceeding. (Doc. 3 at 28-29; Doc. 13 at 55). The State asserts that Decambra is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard. (*Id*. at 55-60).

### A.      State Court's Decision

Decambra presented this claim to the state courts as Ground VII of his first 3.850 motion. The state circuit court conducted an evidentiary hearing and denied relief as follows:

> As to Ground VII, Mr. Decambra alleges that trial counsel was ineffective in failing to properly prepare for trial. This Court has reviewed the testimony offered on behalf of Mr. Decambra and finds said testimony to lack credibility when contrasted with the testimony offered by the State, including the testimony of attorney Ruiz, as well as that of his assistant, and this Court's review of the trial transcripts.

> Accordingly, this Court finds that asserted Ground VII fails to establish that attorney Ruiz's performance was deficient and having found no deficiency, it follows that there was no prejudice to Mr. Decambra. The two prong test set forth in *Strickland*, having not been satisfied, the motion as it relates to Ground VII is DENIED.

(Doc. 13-1, Ex. J at 53-60). The First DCA affirmed.

## B.   Decambra's Claim Does Not Warrant Habeas Relief

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not indicate its reasons for upholding the circuit court's judgment, this court presumes that the First DCA adopted the circuit court's reasoning. *Wilson*, 138 S. Ct. at 1192.

The state court reasonably determined that Decambra failed to carry his burden to show that Ruiz's trial preparation was deficient performance. Ruiz testified at the postconviction evidentiary hearing that he spent "a lot of time" preparing Decambra's case and that he met with Decambra for "dozens of hours. . . . [d]ozens, dozens." (Doc. 13-1, Ex. J at 155, 158-59). Ruiz described:

> My recollection is he preferred to have weekend appointments so I'd take time off from the house and meet with him on Saturdays or Sundays.
>
> . . . .
>
> We had meetings late, I can't tell you how many times we talked and discussed this case. There were times when actually I had to actually cut the meeting short after two hours. I mean, I literally had to say, look, I have other clients. But it's dozens of times, hours, hours, hours.

Page 58 of 82

(*Id*. at 155, 159). Ruiz also hired a private investigation team who conducted a thorough investigation and interviewed every possible witness, including A.R.'s neighbors and his former housekeeper Ms. Neal. (*Id*. at 160). Ruiz described: "It was very thoroughly conducted and anybody with knowledge of the case that we knew at that time, you know, was interviewed." (*Id*.). Decambra, himself, was "very happy" with the pre-trial investigation. (*Id*.).

Ruiz's legal assistant confirmed that Ruiz spent more time meeting with Decambra than with any other client. She testified that she did not work on weekends, so had no personal knowledge of weekend meetings, but outside of weekends she had personal knowledge of at least a dozen meetings. (Doc. 13-1, Ex. J at 142 (McDonald Test.)).

The only specific deficiency Decambra elaborates concerning Ruiz's trial preparation is that he waited until the morning of trial to depose the victims. (Doc. 3 at 27). Ruiz testified, however, that this was a strategic decision. Ruiz's general strategy was not to take depositions at all because "it just prepares the State of Florida for their trial, quite frankly." (Doc. 13-1, Ex. J at 160). Ruiz decided to wait until shortly before trial to take the victims' depositions. He took A.R.'s and W.M.'s depositions the morning of trial, discussed them with Decambra, and was prepared to cross-examine them. (*Id*. at 159-60, 169-70).

As to Decambra's specific complaint of Ruiz failing to impeach A.R. with his deposition testimony that he and Decambra had oral sex only once, Ruiz testified that he was aware of the inconsistency but strategically chose not to cross-examine A.R. on that point. (Doc. 13-1, Ex. J at 170). Ruiz explained that cross-examining a disabled sex abuse victim involved "a delicate balance" and: "In my opinion, talking to a jury, I don't think they would be concerned whether they engaged in fellatio one time or four times." (Doc. 13-1, Ex. J at 159, 170). The State had charged Count I (the reciprocal oral sex count) as occurring within a particular time period, not as a discrete number of acts. (Doc. 13-1, Ex. A at 10-11; *see also* Ex. 13-1, Ex. C at 33-34 (prosecutor's explanation for charging the crime that way)).

On this record, a fairminded jurist could agree with the state court's conclusion that Decambra failed to carry his burden to show that Ruiz's trial preparation was so deficient as to constitute a violation of the Sixth Amendment. Decambra is not entitled to habeas relief on Ground Six.

**Ground Seven**    **"The State courts unreasonably applied well-established federal law from the Supreme Court of the United States and/or failed to properly extend such well-established federal law to this case relating to trial counsel's failure to disclose and take steps to remedy an irreconcilable conflict of interest while representing Petitioner during the underlying criminal proceedings." (Doc. 3 at 30).**

Decambra alleges that during the evidentiary hearing on his first Rule 3.850 motion, Ruiz revealed that his daughter was sexually battered by his brother-in-law and that he was experiencing marital discord. (Doc. 3 at 30; Doc. 7 at 40). Ruiz indicated that these personal issues dated back to the time of Decambra's trial in 2011. Decambra claims that the sexual battery of Ruiz's daughter created "an irreconcilable conflict of interest" for Ruiz, and that he should have disclosed and remedied that conflict. Decambra alleges that Ruiz's alleged conflict adversely affected his representation of Decambra in the manner described in Grounds One through Six above. Decambra maintains that had he known of this "conflict of interest," he would have retained new counsel. (*Id*. at 30-31).

The parties agree that Decambra exhausted this claim by presenting it to the state courts in his second/successive Rule 3.850 proceeding. (Doc. 3 at 31-32; Doc. 13 at 61).

## A.   State Court's Decision

For context, Decambra's trial was on March 10 and 11, 2011. (Doc. 13-1, Exs. C-E). The evidentiary hearing on Decambra's first Rule 3.850 motion was on January 16, 2015. (Doc. 13-1, Ex. J at 65). During the evidentiary hearing, Decambra's postconviction counsel (his present habeas counsel) began his cross-examination of Ruiz by asking him if he had been removed from all of his appointed

criminal cases in that circuit. (Doc. 13-1, Ex. J at 164-65). The State objected on grounds of relevance. (*Id*. at 165). The state court indicated that it would "allow leeway," explaining: "I don't know if there's a temporal relation or not but I'm going to let [postconviction counsel] explore that a little bit." (*Id*.).

Ruiz testified that he had been removed from all active, pending appointed criminal conflict cases. (*Id*.). When postconviction counsel asked Ruiz why he had been removed, this exchange occurred:

> MR. HUTCHINS [for the State]:  Objection, Your Honor, again to relevance. This has occurred years after this case. It has no relevance whatsoever as to what happened and his representation of this defendant during the course of this trial which occurred back in 2011.
>
> THE COURT:  And again, we're operating without a jury and I'm going to let you put the time line on this and then I'll decide whether I'm going to consider it or not. But I will let you make a record so that there is a record so that someone can later decide if I've done whatever I should or not, all right?

(*Id*.).

Ruiz answered the question:

> A:    Because my daughter was raped and I wasn't in a position to take any more criminal cases.
>
> Q [Postconviction Counsel]:    Is this why then it's identified as you having a pattern of missing your court appearances?
>
> A:    There were two court appearances I missed, that's correct.
>
> Q:    Would you say then that this pattern was only recent?

Page 62 of 82

A:    I'm sorry?

Q:    Would you say that this pattern of missing court events was just recent?

. . . .

A:    These court appearances were about two months ago.

Q:    Prior to that were you having any personal difficulties that would cause you to miss important court events?

A:    Yes.

Q:    And I'll take you all the way back to 2011.

A:    My brother-in-law repeatedly raped my daughter, and I'm going through a divorce and that caused some problems for me.

Q:    And this included the time of this trial back in 2011?

A:    I was in marital discord back then, yes.

Q:    Was this one of the reasons why you waited nearly two years to the very, very day, the morning of trial to depose the two accusers in this case?'

A:    No, not at all.

Q:    Why did you wait so long?

A:    Strategically.

(*Id*. at 166-68). Postconviction counsel then questioned Ruiz further on his trial preparation and strategy. (*Id*. at 168-77).

During the State's re-direct, Ruiz testified:

Q [Mr. Hutchins for the State]:  And let's go back to the time that you conducted this trial. You were still getting conflict cases at that time; is that correct?

A [Ruiz]:    Dozens.

Q:    Okay. And you continued to get conflict cases for years after this; is that correct?

A:    Correct.

Q:    And it was just recently, within the last couple of months, that you were –

A:    And may I clarify something?

Q:    Yes, sir.

A:    Okay. I took a case that took me out of the country for three months, to South America, and it was a case involving the death of a U.S. citizen. And we made staff changes and unfortunately things weren't getting calendared properly. I personally took the initiative to go to Alex Morris, a former law partner of mine, and asked him to take those cases from me. Judge Francis agreed to give those cases to Mr. Morris and that's what occurred.

Because I didn't feel like I could handle a case. The case involved the death of Jimmy Buffett's goddaughter in the Galapagos Islands. And I didn't feel I could handle the cases here and the cases there. So I took the initiative to go to Mr. Morris and give my conflict cases to him as an attorney should do.

THE COURT:    In general, let me tell you. Of now, there is a bit of record here now but this to me temporally doesn't have much to do with what we're talking about today. So I wanted to kind of preclude going much further down here. Because again, before I wanted to allow Mr.

Page 64 of 82

Murray to inquire. Because again, I want you to have your record too. But I just want, at this point what we're talking about now just doesn't seem to me to be involved in what we were dealing with in 2011.

MR. MURRAY:   I tend to agree, Judge.

MR. HUTCHINS: And I agree, Judge, that's why I objected. And the only reason I'm asking questions is because the Court allowed Mr. Murray so—

THE COURT:       And again, I just don't want to put Mr. Ruiz through more than we have to. And it just seems to me that we've sufficiently covered this ground. And you know, if Mr. Ruiz wants to say anything more or volunteer any more, he can, but I'd just as soon shut it down at this point.

BY MR. HUTCHINS:

Q:    One last question, Mr. Ruiz. When you went to trial in this case, did you make tactical decisions throughout the course of the trial that you felt were in the best interest of your client?

A:    Absolutely. I had a very good relationship with Mr. Decambra. We had a very good working relationship. I had a good relationship with his wife. We never fought. We had heated exchanges in trial prep because I don't pull any punches. But, I mean, we had a good relationship. There was never any animosity. We both got along just fine. I did the best I could for him.

My only issue, I have a couple of issues but I just think as I've told you, I just felt like the sentence in this case was completely over the top. I'll leave it at that.

Q:    The last question and then I'll sit down. When you went to trial in this case did you feel that you were absolutely prepared to go forward—

A:    Yes.

Q:      —with the best defense you could?

A:      Yes.

(*Id*. at 180-82).

Postconviction counsel argued in closing argument that Ruiz's lack of trial preparation and other deficiencies outlined in his postconviction motion were the result of Ruiz "having some personal issues that were affecting him at the time." (*Id*. at 202).

The state court in Decambra's first Rule 3.850 proceeding denied relief on all claims. (Doc. 13-1, Ex. J at 52-62). The court found as follows concerning Ruiz's "personal issues:"

> The Court further notes that a proffer was made by counsel for Decambra regarding some professional difficulties attorney Ruiz is alleged to have had recently. This Court allowed the Defense to explore the issue as to whether any of those allegations temporally related to the matters currently before this Court. As this Court announced during the January 2015 hearing, this Court finds that any current difficulty is <u>not</u> temporally related to the issues before this Court and in this Court will not comment further on those alleged issues.

> . . . .

> *This Court finds there were no conflict issues at the time of trial and that his tactical decisions made throughout the trial were consistent with his best efforts.*

(*Id*. at 58-59) (emphasis added). The court went on to find that Ruiz was prepared for trial and that his tactical decisions were reasonable. The court concluded that Decambra failed to satisfy the two-pronged *Strickland* standard with regard to any of his claims. (*Id*. at 59-60).

Decambra appealed the denial of his first Rule 3.850 motion. Decambra's counseled appellate brief argued, with regard to Decambra's trial preparation claim (discussed in Ground Six, above) that the lower court erred in denying his claim that Ruiz was ineffective for waiting until the morning of trial to depose the victims. (Doc. 13-9, Ex. Q at 42-47). Counsel argued that the lack of trial preparation was due to "significant personal issues at the time of the appellant's trial that were affecting him, including the sexual battery of his daughter by a member of his wife's family and substantial marital discord between he and his wife." (*Id*. at 45). The First DCA affirmed the lower court's order.

Decambra then filed a *pro se* second/successive Rule 3.850 motion. (Doc. 13-9, Ex. AA at 13-23 (Original Mot.); *Id*. at 6-11 (Supp.)). Decambra claimed that Ruiz's testimony at the evidentiary hearing provided "newly discovered evidence" that he was subject to a conflict of interest due to his daughter's sexual battery. (*Id*. at 16-19). Decambra argued that this alleged conflict adversely affected Ruiz's representation in the ways described in his first Rule 3.850 motion. (*Id*.). Decambra

contended: "[T]he record does not show that the conflict of interest was adequately explored and whether or not trial counsel had any ill will towards the defendant because of the alleged charged offenses and that the fact his daughter was being repeatedly sexually assaulted by a family member (his brother-in-law)." (*Id*. at 19).

The state circuit court denied Decambra's second/successive Rule 3.850 motion for these reasons:

> Defendant had a previous evidentiary hearing on his first postconviction motion. Defendant's trial attorney, Adam Ruiz, testified at that evidentiary hearing that his daughter was raped and he was going through a divorce at or near the time of trial. Defendant claims this created a conflict because he was charged with a sexual offense. In his supplement, he includes Mr. Ruiz' bar reprimand for misconduct unrelated to Defendant's case, but occurring in the same period of time.
>
> Whether there was a conflict or not, Defendant raises claims that are identical to his first postconviction motion that were heard at an evidentiary hearing and denied on the merits. *Attachment A (Motion)*; *Attachment B (Order)*. Defendant does not point to any new deficiencies or prejudices that occurred as a result of this alleged conflict. Defendant has no claim for relief, and therefore the motion is summarily denied.

(Doc. 13-9, Ex. AA at 163-64). The First DCA summarily affirmed without explanation. (Doc. 13-9, Ex. BB).

The First DCA's affirmance is an "adjudication on the merits" of Decambra's claim, and, therefore, is entitled to deference under § 2254(d). *Richter*, 562 U.S. at 99, 100. Because the First DCA did not provide a reasoned opinion, this court

Page 68 of 82

presumes that the First DCA adopted the lower court's reasoning. *Wilson*, 138 S. Ct. at 1192.

### B.   Decambra's Claim Does Not Warrant Habeas Relief

The state circuit court in Decambra's second Rule 3.850 proceeding determined, reasonably, that Decambra's claim was grounded in an allegation that was raised in his first Rule 3.850 proceeding and denied on the merits, namely, that Ruiz's daughter's sexual battery adversely affected Ruiz's representation. The court in Decambra's second Rule 3.850 proceeding also determined, reasonably, that Decambra identified no new deficiencies in Ruiz's performance in his case, but instead relied on the same deficiencies he identified in his prior Rule 3.850 proceeding.[18] The court determined that Decambra's reassertion of the same allegations under a conflict theory did not undermine the prior state court's conclusion that Decambra failed to establish a Sixth Amendment violation.

The court in Decambra's second Rule 3.850 proceeding then deferred to the first Rule 3.850 court's rulings. One such ruling addressed the potential conflict of

---

[18] Decambra also included allegations and evidence that Ruiz had been disciplined by the Florida Bar in *other cases* for "dereliction of his duties." (Doc. 13-9, Ex. AA at 6; *see also id.* at 6 (asserting that "trial counsel's mental and personal issues interfered with other clients and their representation by this same attorney.")). But Decambra provided no new evidence that Ruiz's "personal issues" adversely effected his representation of *Decambra*. (*Id.* at 6-93).

interest. The first Rule 3.850 court determined that to the extent Decambra (or the record) suggested that the daughter's sexual battery created a potential conflict of interest for Ruiz, there was no actual conflict. (Doc. 13-1, Ex. J at 58-59). Decambra did not provide the second Rule 3.850 court with any new evidence of an actual conflict.

The first Rule 3.850 court also ruled that Ruiz's representation of Decambra was based on strategic decisions grounded in Decambra's best interests; that Ruiz's representation was the product of his best efforts; and that none of the alleged errors Decambra identified constituted defective performance. (Doc. 13-1, Ex. J at 58-60 (Order); *see also id.* at 182 (Ruiz's Evidentiary Hr'g Test.)). The second Rule 3.850 court reasonably relied on these determinations.

The court in Decambra's second Rule 3.850 proceeding concluded that Decambra failed to establish a Sixth Amendment violation because (1) as the prior Rule 3.850 determined, Decambra did not establish that there was an actual conflict; (2) Decambra failed to satisfy his burden to show that Ruiz's performance was defective; and (3) Decambra failed to show that the sexual battery of Ruiz's daughter during Ruiz's representation of Decambra had a probable effect on the outcome of Decambra's trial.

Decambra asserts here that the state courts "unreasonably applied well-established federal law by the Supreme Court of the United States relating to counsel operating under actual conflicts of interest and/or have failed to properly extend that well-established federal law to this case." (Doc. 3 at 31). Decambra elaborates that the state court unreasonably applied the *Strickland* standard, (Doc. 7 at 39; Doc. 17 at 15), but he also maintains that his situation fits under the presumed prejudice rule of *Sullivan v. Cuyler*, 446 U.S. 335 (1980). Decambra argues:

> Unlike most cases of ineffective assistance, in cases where a conflict of interest is identified, the only prejudice that a defendant needs to show is that the conflict actually affected the attorney's performance.

(Doc. 7 at 39; *see also* Doc. 17 at 15-16 (suggesting that his burden was to show only "that the performance was affected, not that the outcome of the trial was affected")).[19] Decambra maintains that he established a Sixth Amendment violation because Ruiz admitted at the evidentiary hearing that although it was his strategic decision to wait until shortly before trial to depose the victims, the reason he deposed the victims the *morning of trial* was because he had scheduled their depositions nine

---

[19] The *Sullivan* case involved concurrent representation of codefendants. *Sullivan*, 446 U.S. at 347-48. The Court held that in the absence of an objection by counsel, a defendant claiming a violation of the Sixth Amendment must demonstrate that "a conflict of interest actually affected the adequacy of his representation." 446 U.S. at 348-49. Once the defendant makes that showing, prejudice is presumed. *Id.*; *see also Mickens v. Taylor*, 535 U.S. 162, 168, 173 (2002) (explaining the *Sullivan* standard).

days earlier, but missed them. (Doc. 7 at 41). Decambra asserts that it was unreasonable for the state court in his second Rule 3.850 proceeding to deny his Sixth Amendment claim without deciding whether there was a conflict of interest, and that it also was unreasonable for the state court to find that he failed to establish prejudice, because "the prejudice prong in conflict cases requires only that a defendant show that his performance was affected, not that the outcome of the trial was affected." (*Id*. at 42).

Decambra ignores the fact that the first Rule 3.850 court determined that Ruiz's representation of Decambra while also dealing with his daughter's sexual battery was *not* a conflict of interest and did *not* undermine the effectiveness of Ruiz's representation. (Doc. 13-1, Ex. J at 59). Decambra's second Rule 3.850 motion offered no additional proof of an actual conflict or of defects in Ruiz's performance *in Decambra's case*. Instead, Decambra relied on his prior allegations of deficient performance, Ruiz's prior testimony at the evidentiary hearing, and evidence of disciplinary action in *other* cases. (Doc. 13-9, Ex. AA at 15-21, 36-39).

The Supreme Court has never found the existence of an actual conflict, or a violation of the Sixth Amendment, under the circumstances of the present case. Because none of the Supreme Court's cases confront "the specific question presented by this case," the state court's decision cannot be "contrary to" any holding

Page 72 of 82

from the Supreme Court. *See Lopez v. Smith*, 574 U.S. 1, 6 (2014); *Woods v. Donald*, 575 U.S. 312, 317 (2015).

Nor was the state court's decision an unreasonable application of the Supreme Court's cases. Within the contours of *Sullivan*, *Holloway v. Arkansas*, 435 U.S. 475 (1978), *Wood v. Georgia*, 450 U.S. 261 (1981), and *Mickens v. Taylor*, 535 U.S. 162 (2002), a fairminded jurist could conclude that Decambra was not entitled to an exception to the general rule of *Strickland*. The Eleventh Circuit has long recognized that no Supreme Court decision holds that prejudice should be presumed to any extent where the asserted conflict of interest does not arise from concurrent multiple legal representation.

In *Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006), a habeas petitioner claimed, as Decambra does here, that an asserted conflict of interest affected his trial counsel's representation. The asserted conflict in *Schwab* arose from the fact that trial counsel was a member of the public defender's office, and the State planned to call five members of the public defender's office to testify to the chain of custody of a letter mailed to that office relating to Schwab's case. *Id*. at 1381-19. Schwab's trial counsel moved to withdraw prior to trial, explaining that he could not effectively cross-examine any of his co-workers to test their credibility because of his professional and personal relationship with them. *Id*. at 1319. The

trial court denied the motion to withdraw. *Id*. At trial, the State called the five witnesses to testify about the chain of custody of the letter. *Id*. Trial counsel insisted that he could not cross-examine the five witnesses, and he did not question them. *Id*.

Schwab claimed that he was denied effective assistance of counsel because his attorneys were "placed in the unenviable position of discharging their duty of advocacy on behalf of their client at the risk of perhaps alienating those persons with whom they work on a daily basis." *Id*. at 1319. The state court denied relief on the ground that Schwab failed to show "substantial prejudice" from the public defender's continued representation of him. *Id*. (quoting *Schwab v. State*, 636 So. 2d 3, 5-6 (Fla. 1994)).

Schwab asserted the same claim in a federal habeas petition. The district court denied relief because Schwab had not shown that he was prejudiced by his counsel's failure to cross-examine and attack the credibility of the witnesses from the Public Defender's Office. *Id*. at 1320. The Eleventh Circuit affirmed. The Eleventh Circuit held that with the exception of a conflict claim based on *concurrent multiple representation*, no Supreme Court decision dictates that a court apply any standard other than *Strickland*'s performance and prejudice prongs to a defendant's claim that his trial counsel was subject to a conflict of interest.

The court in *Schwab* explained:

In 2002, nearly eight years after Schwab's conviction became final, the Supreme Court stated in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002), that whether *Sullivan* applies beyond multiple concurrent representation cases still is "as far as the jurisprudence of this Court is concerned, an open question." *Id.* at 176, 122 S. Ct. at 1246. After noting many types of personal or financial conflicts to which the courts of appeals have applied the *Sullivan* exception to *Strickland*, the Court cautioned:

> It must be said, however, that the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application. "[U]ntil," it said, "a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." 446 U.S., at 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (emphasis added). Both *Sullivan* itself, . . . , and *Holloway*, stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. . . . Not all attorney conflicts present comparable difficulties.

*Id.* at 175, 122 S. Ct. at 1245 (some citations omitted). The Court itself emphasized its words "actively represented," making clear that the *Sullivan* decision itself covers only active legal representation of conflicting interests, "[n]ot all attorney conflicts." *See id.*, 122 S. Ct. at 1245. In case anyone missed the point, the Court spelled it out unequivocally: "*Sullivan* itself does not clearly establish, or indeed even support, such expansive application," and "whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id.* at 175, 176, 122 S. Ct. at 1245, 1246.

If, as the Supreme Court has told us, *Sullivan* does not hold that a presumed prejudice rule applies outside multiple representation circumstances, so that it is an open question whether the rule of that case should be extended to other types of attorney conflicts, it cannot

Page 75 of 82

be that Supreme Court precedent dictates or clearly establishes that the *Sullivan* rule applies in other conflict situations.

451 F.3d at 1324-25.

The *Schwab* court determined that the state court's rejection of Schwab's claim for failure to establish actual prejudice at trial was neither contrary to, nor an unreasonable application of clearly established federal law because he "made no showing at all that there is a reasonable probability *of a different result in the trial* if his counsel had cross-examined some or all of the five witnesses to the letter's chain of custody." *Id*. at 1321 (emphasis added).

Because the Supreme Court has not held that the *Sullivan* standard applies beyond the context of multiple concurrent representation, the state court's application of *Strickland*'s deficient performance and actual prejudice standard, instead of the *Sullivan* rule, to Decambra's case was not "an unreasonable application of clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Nor was the failure to extend the *Sullivan* rule to this new context unreasonable either. *See Sullivan*, 446 U.S. at 350 ("[U]ntil a defendant shows that his counsel *actively represented conflicting interests*, he has not established the constitutional predicate for his claim of ineffective assistance.") (emphasis added); *see also, e.g., Hand v. Sec'y, Dep't of Corr.*, 305 F. App'x 547, 550 (11th Cir. 2008) (holding that applying *Strickland*'s prejudice standard to claim

Page 76 of 82

that counsel's fee arrangement created a conflict of interest—instead of applying the *Sullivan* standard—was not contrary to or an unreasonable application of Supreme Court precedent; "Because the alleged conflict in this case does not involve the representation of multiple defendants, the state court's decision was not contrary to or an unreasonable application of the *Sullivan* rule."); *Earp v. Ornoski*, 431 F.3d 1158, 1184 (9th Cir. 2005) ("The *Mickens* Court specifically and explicitly concluded that *Sullivan* was limited to joint representation. . . ."); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) ("*Strickland* more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client.") (internal quotation marks omitted); *Smith v. Hofbauer*, 312 F.3d 908, 815-17 (6th Cir. 2002) (concluding that because the question of whether *Sullivan*'s limited presumption of prejudice applies outside the context of concurrent multiple representation remains an open question in Supreme Court jurisprudence, a claim based on extension of the rule outside those circumstances "is not based upon clearly established Supreme Court precedent as mandated by AEDPA").

This leaves Decambra's final argument that the state courts' rejection of his claim involved an unreasonable application of the *Strickland* standard. As discussed above, Decambra's second Rule 3.850 motion alleged no new deficiencies in Ruiz's

Page 77 of 82

representation of Decambra, and made no attempt to show actual prejudice. Instead, he relied on the deficiencies and prejudice alleged in his first Rule 3.850 motion. And discussed in Grounds One through Six above, the state court's rejection of those claims involved a reasonable application of the *Strickland* standard. To the extent Decambra's second Rule 3.850 motion and supplement provided evidence of Ruiz's sub-par representation in *other* cases, the state court reasonably concluded that that does not satisfy the individual, case-specific showing of prejudice required by *Strickland*.

In summary, applying the deference required by the AEDPA, the state courts' rejection of Decambra's Sixth Amendment claim was not contrary to, and did not involve an unreasonable application of clearly established Supreme Court precedent. Decambra is not entitled to habeas relief on Ground Seven.

### C.   This Court Should Not Expand the Record or Hold an Evidentiary Hearing

Decambra's habeas counsel requests that this court expand the record to include additional documents about Ruiz's daughter's sexual abuse, Ruiz's mental health, and Ruiz's disciplinary record with The Florida Bar. (Doc. 17 at 17-21). Habeas counsel also requests that this court "hold a hearing where Attorney Ruiz may answer questions about his state of mind in 2011 and whether his personal life resulted in an undisclosed conflict of interest." (*Id*. at 21).

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185.  If he does not overcome 2254(d)(1), federal habeas relief should be denied and, correspondingly, he is not entitled to an evidentiary hearing.  *Pinholster*, 563 U.S. at 183; *see also Landrigan*, 550 U.S. at 474 (noting that when the state-court record "precludes habeas relief" under the limitations of § 2254(d), a district court is "not required to hold an evidentiary hearing."); *Gaines v. Chairman, Fla. Parole Comm'n*, 745 F. App'x 871, 875 (11th Cir. 2018) ("When a state court has adjudicated the claim presented by the petitioner, an evidentiary hearing may only be granted if the federal court concludes that the state court unreasonably applied clearly established federal law or made an unreasonable determination of fact (citing *Landers v. Warden*, 776 F.3d 1288, 1294-95 (11th Cir. 2015)).

All of the claims raised in Decambra's habeas petition were adjudicated on the merits by the state courts, and Decambra has not overcome the limitation of § 2254(d). Neither an expansion of the record, nor an evidentiary hearing, is warranted.

## IV.    A CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should

issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V.    CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1.  The amended petition for writ of habeas corpus (Doc. 3), challenging the judgment of conviction and sentence in *State of Florida v. Francis X. Decambra*, Leon County Circuit Court Case No. 2009-CF-831, be **DENIED**.

2.  The District Court **DENY** a certificate of appealability.

3.  The clerk of court close this case file.

At Panama City, Florida, this 22nd day of June, 2021.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the**

**district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. R. 3-1; 28 U.S.C. § 636.**